SCA Hygiene Products v. First Quality Baby Products SCA Hygiene Products v. First Quality Baby Products SCA Hygiene Products v. First Quality Baby Products Mr. Black, you may proceed. May it please the Court. The issue before the Court is whether the District Court erred in applying the summary judgement standard to dismiss this case based on latches and to stop it. The facts relating to the letters at issue in the case are not disputed. SCA sent a letter identifying a patent and inviting First Quality to comment. First Quality responded, the patent is invalid, period, case closed. Mr. DeMaggi, who testified in the case, said that, quote, after sending this letter, this matter was never thought of again. Following that, SCA did what we believe was the right thing. They took the piece of prior art that had been identified by First Quality and they went off to the Patent Office and filed for re-examination on their own patent. That doesn't happen very often. It was a signal of good faith on the part of SCA that they were interested in getting the right answer from the Patent Office before starting potentially costly litigation. And they did so. The patent issued from re-examination with new claims, some of which were narrower than the original claims. If they have doubt as to the validity of their patent, why send the letter to you in the first place? They asserted the patent and the lawyers and the folks who were dealing with the issue were unaware of the piece of prior art that was eventually asserted by First Quality. This, of course, happens all the time. It's rare that you send a letter notifying someone of a patent and they write back, yes, your patent is valid, infringed, and we'd like to pay you. There's usually a different dynamic going on. This was a very typical situation. The defendant did a prior art search. They found a patent that they thought invalidated. They wrote to SCA. They provided the patent and then SCA did the right thing. Once litigation commenced, SCA asserted Alachi's defense. They did not initially assert, excuse me, First Quality asserted Alachi's assert equitable estoppel. That defense was only discovered later and brought into the case. The district court erred in several ways. One is he didn't do the proper balancing test because he... So what is the evidence that's necessary in order to overcome a presumptive Alachi's? What's the standard? The standard is, that issue, of course, is addressed in Ackerman in great detail, but it does leave a little bit open to interpretation. Our view is that certainly if the plaintiff rests on the view that the defendant has to make the case, then they lose because their presumption applies. The plaintiff would have to come forward with some reasonable interpretation of the facts, which a reasonable fact finder could conclude justified the delay or that there was, in fact, no real prejudice. Once that happens, the quote, bubble has burst under federal rule of evidence 301 and you're back to square one where the defendant bears the burden of proof. Let me ask you a question, though. Pretty straightforward in your brief. You concede to Ackerman if the Lachi's presumption applies, then there... But Ackerman also says there are two types of prejudice, economic and evidentiary, and you go into great depth on economic prejudice. Where's your discussion of evidentiary prejudice? Evidentiary prejudice was not found by the district court to support the finding here, and it was not addressed by the other side on appeal. It hasn't been argued. The principal defense in the case is... Are both of those elements elements of prejudice, necessary elements? Both of those elements are elements of... If you can show either one, you can prevail on a Lachi's defense. And the district court found economic prejudice but not evidentiary prejudice, which wasn't surprising because the principal defense in the case remains validity and non-infringement, neither of which depend on any potential evidence that was lost. There's been no assertion of that, and to the extent it was argued below, the district court actually rejected that sub silentio when he concluded that economic prejudice applied. When we get to the prejudice point, which cuts across both Lachi's and Estoppel, the question on summary judgment, not after trial, but on summary judgment, is whether a reasonable fact finder could conclude that there really was no prejudice. So we have three different theories here. They have a theory... Well, it's really whether there's any genuine issue of material fact as to whether there's prejudice. Right. Whether there's a genuine issue of material fact. And if there is more than one version of the facts which fits the facts, then we have to try the case. That's the purpose of trial. But the latter is, when you're talking about a genuine issue, you're talking about summary judgment. Yes. And you have a separate standard for Lachi's. Are you saying they overlap or it's the same? We look at it this way, Your Honor. That with respect to Lachi's, to find Lachi's as a matter of law, the first point in the analysis on Lachi's is have you gone over the six years so that the presumption applies? We contest that because of the re-exam period. We don't think the re-exam period should count. But even if the period counts, and even if the court's uncomfortable with that position, we believe that under the law it's very clear that a reasonable behavior, a reasonable reason for the delay, if you will, would suffice to take you outside the prejudice. But in this case, let's say that we even we accept the delay caused by the re-exam. You still waited two years after that. We did, but at that point you have to analyze the case from the perspective of the re-exam ended in 2007 and we sued in 2010. So then we're in a situation where the delay period's three years. No, the delay period is still seven years. It's just you have a good reason for part of it, but you don't have a very good reason for the other part of it. I understand your point, Your Honor, and the question here for us on summary judgment is whether that justification should have been weighed against the prejudice point and the strength of their prejudice argument, the strength of our prejudice argument. Well, I wasn't asking about prejudice, though. I was asking about whether the delay itself was reasonable. And you seem to want to carve out the time during re-exam and say, well, that's reasonable. So then you only look at whether three years after the patent issues is reasonable or not. But you don't look at it like that. You look at the whole delay, the whole seven-year period, and you say, overall, maybe part of it was good, but part of it's not. And what's the genuine issue there over why? Because the district court was very clear, I think, that even if the re-exam proceeding was reasonable, the three and a half years after wasn't. So what's the genuine issue? What evidence can you point to to suggest that waiting three and a half years is reasonable? I think as a matter of law, three and a half years is not an unreasonable amount of time to wait under the current law. You have a presumption after six years, but it can be done without the presumption, can it not? It absolutely can, Your Honor, but there are very few cases, I'm not sure there are any, I don't want to misspeak, there may be one at around three years, but that's very, very unusual. But again, it's not just three and a half years. You knew of what they were doing for seven years. Part of it, you were going to get a re-exam, but it shouldn't have been incumbent upon you as soon as you got that patent to promptly file an infringement suit rather than wait another three and a half years. It certainly would have been better had that's what they had done. It would certainly support the allegation of an apprehension of litigation. Oh, I don't agree with that, Your Honor. I don't believe they had any apprehension of litigation. I think Mr. DiMaggio was clear that once the lawyers told him the patent was invalid, they considered the matter closed and they went about their business. Well, that's because you didn't respond. He said, his quote was, as soon as we sent the letter, the matter was we considered the matter closed, as soon as we sent the letter. And a reasonable way to interpret that is that my lawyer told me the patent's invalid. I don't worry about invalid patents. Business people have to deal with these things all the time. I'm going to deal with the issues that are in front of me. I want to address your point again about delay. Sometimes the laches cases methodically march through all of the elements and finding one after the other and then mechanically reach the result. But what the law actually requires is you look at the delay and any justification for it. You look at the prejudice and any issues of fact around that. But even if you meet those two requirements, then and only then do you do the balancing test to determine whether or not to bar the claim. And you could bar part of the claim. You could bar all the claim. We have patent claims that were issued before in the original patent. We have patent claims that issued after re-exam. We have products from Covidian. We have products that were with first quality. The district court didn't consider any of that because he didn't get to the overall balancing of the equities. So that even if we missed on the delay point, Your Honor, we didn't miss by a lot. We missed by less than a year with a re-exam pending. So even if we get over the technical hurdle one way or the other, it surely should counter our favor. But that's not the district court's analysis the way he applied it. I do want to talk about their theory with respect to... You're almost into your rebuttal time. Okay, I will reserve the rest of my time for rebuttal. Thank you. May it please the court. I just want to start with Mr. Dimagi's testimony. And what he really said was the fact that we never heard back from SCA once we sent them this letter that you have put in front of me. We never heard back from them. And as a result, we did not consider it to be an issue because we did not know what, if any, issue existed for us to address. Do you have a site for us for that? Yes, I do, Your Honor. It's A0338. And it's at lines 12 to 24. While you're giving us sites, on page 2 of your responsive brief, you say at the bottom SCA was well aware of First Quality's investments. Where's the basis for that? That they were well aware? As we say in the detailed section of the brief, they had a competitive intelligence department that was monitoring everything that we were doing. In fact, they even knew about our acquisition of THRG before it happened. And I can point to a record pages 941 and 942. So this is an SCA document. And the date of the document is December of 2007. Now what's interesting about this document is that the reexamination issued in March of 2007. So this is months after the reexam. And if you look on page 942, there's a bullet point, market development, competitor activities, and changes in market structure. And under that, there's a second bullet point, First Quality announced plans to acquire Covidian. So here it is. It's after the reexam. There's no reason for them not to come to us and say, you're wrong. They said the patent was invalid, but you're wrong. And now you have to stop. They didn't say anything. Not only did they didn't say anything, but they were watching everything we were doing. And they knew that we had announced that we were going to buy this company, which we ended up doing in April of 2008. So they really did sit idly by and let the  Do you find that the motivation for purchasing THRG was a genuinely disputed question? Can summary judgment still have been granted? It was not a genuinely disputed question. I'm sorry, your Honor. I said if we find that it was, could summary judgment still stand despite that? Well, it's not the only. No, I think summary judgment could still stand because we also have the fact that we purchased three new adult incontinence lines to make these products, the last one of which cost over $10 million. We have sales going from $45 million in 2004 to $350 million in 2010. This took off. We bought more equipment. We made capital expenditures. And we also have testimony from Mr. Silvanovitz that he abandoned an alternative design because at the time it cost too much money and there was no complaint, so why would you do it? So I think it still does stand, your Honor. In that regard, I just want to make a point about the reply brief. You brought up the investments. Why is there no genuine issue material fact regarding prejudice? On the economic? They don't contest the fact that we purchased three new lines and that we spent, on the last line alone, we spent over $10 million during this delay. But there's nothing that shows that you did that notwithstanding the threat. Well, I mean, if the issue here is... I'm sorry, yeah. The reliance here on the misleading conduct was total and complete. We had a letter saying that we infringed. We wrote back and said, we think the patent's invalid. Four months later, they sent us another letter about another patent. And they said, oh, okay, you infringed this patent and it's a different patent and different product. We referred to the old correspondence. They said nothing. They said nothing about the patent that they ultimately sued on. It's the same fact situation we had in the Aspect case. But in their brief, they make a lot of argument and allegations that you would have gone ahead and carried out your business whether there was threat of infringement or not. Why isn't that enough to create a genuine issue of fact? Because it's all attorney argument, Your Honor. And the record in this case is crystal clear what we did. And it's Moshe Oppenheim's testimony that now they're claiming that there's credibility issues. But in front of the judge, they never claimed that. But his testimony is supported by Mr. Damagi's testimony as well. And the testimony is at A990 to A1013. And the testimony is they weren't going to do the deal with Covidian. They weren't going to buy THRG unless they got a clean bill of health and that there were no IP issues. And that testimony is supported by Mr. Damagi at A335 to 340. And in fact, THRG was involved in a lawsuit with Kimberly Clark. And Mr. Oppenheim testified that part of the deal was they had to settle that lawsuit. Now in the reply brief, SCA tries to confuse the issue and talk about another lawsuit that we have with Kimberly Clark that's ongoing. We actually have two. That has nothing to do with the lawsuit that THRG had with Kimberly Clark. That lawsuit had to get settled and it was settled. It was a Mexican facility that had an IP problem. And so we didn't buy the Mexican facility. We just bought the assets. We went through great pains to make sure that there were no IP issues. And if this SCA, if they had sued earlier, if they had sent us a letter after the re-exam had issued and told us there was a problem, the undisputed testimony in the record is things would have been done differently. The deal would have been restructured. What's the evidence that the investments were made as a result of the delay? The evidence is the evidence I just talked about from Mr. Oppenheim that we would have structured things differently if we knew there was a problem with SCA. The reliance here was complete. We had this first issue with them. Four months later, they raised a different patent. They never talked about this patent again. And as Mr. DiMaggio said, one, they never came back to us. So there was nothing for us to follow up on. And two, this was never thought of again. This is the ultimate in reliance. They did an excellent job convincing us that there was no issue here at all. And after that, we operated as if there was no issue. But is there any evidence where the risk was considered? I mean, actually considered and said, and determination is made, well, there's no risk here. Let's go ahead with these investments. We have this risk pending, this potential liability. You know, as part of due diligence, we've got this potential liability. Let's go ahead with this investment. No, because, Your Honor... Isn't that a material issue of fact? No, because it was off the table. It was out of... For the economic problem. That's not material? What's material is, what would have this alleged infringer have done differently? And there, the evidence is crystal clear that the... And it's undisputed that when we went and bought THRG, we would have done things differently. We would have structured the deal differently. And there's no dispute on that. And that's what Mr. Oppenheim testifies to. There were three parts to that deal. There was baby diapers, there was FemHi pads, feminine hygiene pads, and AI. And the testimony is that the adult incontinence, which is the subject of this suit, was the least important. And if there was an issue with those, we could have severed it. And I'd like to just... Your Honor, this... Can I ask you about the equitable estoppel point? Yes. Let's just set aside the latches. Why is... I understand that the inaction and follow-up might lead to latches, but why is that good enough under a case law to amount to a misleading communication? It seems like our case law suggests that just silence is not enough. We have more here than silence. We have the initial silence of not responding to the initial two letters. We have two silences, right? You have two letters and two... But is two enough? Because it seems to me that at least some of our case law suggests the silence has to rise to the level of bad faith. And I don't get that from failure to respond to two letters. Well, it's... Let's go through the letters. The first letter, they didn't respond to it all. The second letter, they said we infringed a different... Well, they responded by going to the PTO. Right, which they did not tell us. It's a public record, though. And that's true, it's a public record, but the case law requires that they tell us, and they tell us that proceed at your own risk. When you're done, we're going to... If we get a patent, we're going to come after you. And they never did that. And, Your Honor, the funny thing is, it is a public record. We weren't aware of it. But even if we were aware, when the re-examination was over in 2007, they still waited three and a half years to sue us. So what were we supposed to take from that? You know, really was... This was over. Are you saying our case law requires that notice should have been given? Walkerman says that in certain situations, those where there's prior contact, you have to have notice. Notice may be required if there's prior contact. This is exactly the kind of case where notice is required. The key question in Walkerman is if the alleged infringer had reason to believe that... If you gave him reason to believe that this matter was over... Show me where in Walkerman we say that. I'm sorry? In Walkerman, yes. I'm reading from Walkerman at page 19 of the Lexis version. And it says, there can be no rigid requirement in judging a latch's defense that such notice must be given. That doesn't say it requires notice. It says it doesn't require notice. Well, if I can keep going, Your Honor, if I may. It then says, for example, if the defendant is aware of litigation from other sources, it would place form over substance to require specific notice. And then it says, citing the Volpell case, where there is prior contact, the overall equities may require appropriate notice as in James Berry. It says it may. You're absolutely right, Your Honor. And if you look at James Berry and you look at Hall, this is the sort of situation where you have to give notice because there was prior contact. Okay, so the record reflects that when you're purchasing THRG, that consideration was given to the IP issues that were out there. But there's no mention as to any patent infringement issues. Can you show me in the record where in the purchase of THRG that the risk of patent litigation was a factor? Yes. I would go to 990 to 1013. It's Mr. Oppenheim's testimony. And I also have Mr. Damagi's testimony at 335 to 340. Why don't we go there first since they don't dispute his testimony at all. 335. A335. And the question beginning at line 4. Sure, I'm sorry. Okay. But here's the question asked to Mr. Damagi. Do I understand your testimony correctly that had SCA sued earlier, it would not have impacted First Quality's on whether to buy the Tyco Group? And Mr. Damagi explains we would have taken a different approach in a sense that my answer would be that we would have. We would have definitely followed through with the acquisition. But we would have asked Covidian as the owner of THRG to make sure that they gave us a full clearance on that particular patent amongst other clearances that they give us for various reasons. Financial related, IP related, legal related, employee claim related. We got a full, clean bill of health from Covidian on a multitude of things. Previous standard information. Doesn't this indicate that the acquisition would have happened anyway? You just would have sought the There's more evidence that we would have restructured the deal. There's actually, the evidence in the record is at one point the price was wrong. You're talking about economic prejudice. Yes, your honor. You're pointing me to where a business decision would have been restructured differently. Not that the business decision would not have been made at all. There's actually evidence that we wouldn't have made it at all as well. At one point we put a price Where is that? It's in Mr. Oppenheim's testimony. And I'll tell you exactly where it is. 990. A990. And it starts A990, line 3. And the question was, a general question about our attempt to acquire THRG. And in the answer along, around lines 12 was that there were two processes. We had done due diligence and at some point within the process we actually walked away from the deal and said we didn't want to do it. And it wasn't until they came back to us and we actually finished the process and finished the acquisition. And if you look at the next page it was all about pricing. So we put a price on the table and they said, oh that's no good. You have to do better. We walked away. How does any of this relate to the threat of patent infringement? Their argument, your honor, is that we had to it's an estoppel point. Their argument is we had to do this deal and we would have done this deal no matter what. And the answer is, your honor, that we didn't have to do this deal. And that's in Mr. Dimagi's testimony and Mr. Oppenheim's testimony. If I could make one last point, I know my time is up. Very quickly. In the reply brief the SCA makes an argument that First Quality's, it's on page 12 at the bottom, First Quality's marketing director made it clear that it would have been fatal to First Quality if it could not offer its underwear line in combination with the baby diaper and feminine hygiene product lines. None of the sites support that. That is not true. The testimony is all about just adulting pot lips. Mr. Black, I'm going to give you an extra minute on rebuttal. Don't feel compelled to use it. Thank you, your honor. My colleague cited the court to page 338 of the appendix. Page 340 339 over to 340. This is the deposition of Mr. Dimagi. Question, when did, was there any particular point in time when First Quality began to rely on no communication from SCA with respect to conducting its business for the sale of protective underwear? Answer, I truly do not understand the question. It's read back and then he answers quote, my answer is after sending this letter this matter was never thought of again, period, unquote. Not alone they were not relying upon anything that SCA did or didn't do when they Well, do you think that because he gave a slightly different answer than he gave on 338, that's enough to create a genuine issue? Because on 338 he says, did First Quality rely on actions? And then his answer is the fact that we never heard back from him. Shouldn't we really read this as, this is just a different formulation of that answer? Your honor, you have to give all, this is summary judgment, all reasonable inferences have to go to SCA. And this is the businessman and the president of the somebody told him, his patent lawyers told him, you got an invalid patent here, don't worry about it. No, it's saying that we never heard back. It's not saying we never considered the But there's no evidence, as you were questioning any evidence that they ever thought again about the patent, that it entered their minds, that they had any thought that they were Well, your opponent pointed to where they restructured the deal and actually walked away from one and came back. I want to address that. So what we would have said at trial had we gotten the opportunity is we would have, we would have proved the following. The business at issue here is private label products sold mostly in this country. That means Walmart, CVS and a few others. The facts are undisputed that First Quality has about 100% of that market in the United States. They dominate the market and there are documents that are in the record that talk about how important it is to dominate that market in adult underwear. At Walmart and other places, and the marketing testimony was clear, in order to be successful, you need to be able to provide somebody like Walmart with a full line. Adult underwear, feminine products, things of that nature. And that's the private label product for Walmart. Understandably, they don't want to deal with a whole bunch of different I caution you on any confidential information then. I think I won't talk about the sales numbers. I was going to be very careful there. They are in the record and they're very significant. This was a significant business. This was First Quality's business plan. But I understand all this. I mean you made all these arguments in your brief that this is important to them and things like that. But it doesn't that doesn't mean that they wouldn't have altered their plans if you had followed through on patent infringement claims in a more timely manner. I mean they point to specific testimony that they would have altered their plans. What specific can you point to to create a triable issue on that? Not just an argument about marketplace and things like that. The law as I understand it, Your Honor, is if there's a set of facts and there are multiple inferences from those set of facts, you have to give the inference to us. The facts here are that there are two very good reasons. Two alternative reasons why they would have gone through with this transaction and why had we filed suit not mattered at all. One, they had a belief. Is there any testimony from anybody that suggests that they would have gone through no matter what? Or is it just an attorney argument? The testimony cited in our brief of the marketing people and it's the whole story, Your Honor. It's the whole story here of what they were trying to do. What their business plan was and what we would be able to prove at trial with respect to the evidence. We have documents showing this was really important to them. We have documents showing that they obtained 100% of the market. We have documents showing that they could not have done it without the adult incognizance mark. One last point. This is a very odd form of prejudice they're asserting. They're saying that if we had sued them, not that they would have picked a different product, but most of the other cases you have declarations from people who say, well, we had two versions of the product. This is the Aspects case. One was very early in development, but we could have switched if the suit had been brought earlier. We don't have that here. What we have is them saying that in a gigantic deal, a gigantic transaction was going on. If we had sued First Quality on First Quality's product because we never threatened the Covidian materials. If we had threatened First Quality with infringement and filed suit, that they would have gone to a deal partner and said, you know what? We're not going to do this deal unless you go off and talk to SCA and get a license. That's not really that plausible. Covidian would have said, why should we talk to SCA? They've never accused us of... Why does it have to be about them getting a license? If there's this threat of patent infringement stuff going on in your products that they're going to purchase this company may infringe, that may affect the price because it may end up affecting whether they get a license with you when you sue. And that can certainly affect the pricing of the deal. The difficulty, Your Honors, we don't know what would have happened. We have testimony from someone... We have a lot of testimony from them and I don't see anything specific from you. It's not the sort of testimony which can support summary judgment, Your Honor. It's testimony about their motivations and what they would have done... I don't understand why it can't support summary judgment. They make in their summary judgment motion, here are undisputed facts. And they point to testimony that supports them. State of mind. You've got to rebut them. State of mind. Yeah, but you had the opportunity to depose their witnesses and it was all consistent. State of mind, Your Honor, is not something that can be dealt with in summary judgment. So any time this kind of issue comes up it has to go to a jury? If the issue is something that's a verifiable fact it could not possibly be the other way. If their CFO came in and said we made X million dollars in May of 19... So any time this is talking about business plans and any attorney can come up with a reasonable thing it has to go to a jury? If there's two reasonable... If you look at all the facts and there's two reasonable determinations as to what would have happened here. But your reasonable view of the facts has to cite to some evidence. It can't just be unsupported. The evidence we've cited is their desire to get into this business. Okay, I understand. Thank you. We'll take these cases under advisement and this court will stand in recess.